**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **NEC Corporation,** | |
| Plaintiff, | |
| v. | **TRIAL BY JURY DEMANDED** |
| **Becker Professional Development Corporation** | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

1.     Plaintiff, NEC Corporation ("Plaintiff" or "NEC") files this Complaint for patent infringement and demand for jury trial against Defendant Becker Professional Development Corporation d/b/a Becker Professional Education ("Defendant" or "Becker"), and alleges as follows:

### NATURE OF THE ACTION

2.     This is an action for patent infringement under the Patent Laws of the United States, Title 35 United States Code ("U.S.C.") against Becker for infringement of U.S. Patent No. 8,909,809 (the "'809 Patent") and U.S. Patent No. 8,595,779 (the "'779 Patent") (collectively the "patents-in-suit"), which are attached as Exhibits A and B, respectively, and incorporated herein by reference, pursuant to 35 U.S.C. § 271, to recover damages, attorneys' fees, costs, and pre- and post-judgment interest.

### THE PARTIES

3.     Plaintiff NEC is a corporation organized under the laws of Japan, with its principal place of business at 7-1, Shiba 5-chome Minato-ku, Tokyo 108-8001 Japan.

4.     Upon information and belief, Defendant Becker Professional Development Corporation is a corporation organized under the laws of the State of Delaware, with places of business at least at 10260 N Central Expressway, Dallas, TX 75231 and 399 S Spring Ave Ste 108, Saint Louis, MO 63110-1216.  Becker conducts business, either directly or through its agents, on an ongoing basis in this judicial district and elsewhere in the United States and has a regular and established place of business in this judicial district, as discussed below.

## JURISDICTION AND VENUE

5.     This action arises under the patent laws of the United States, 35 U.S.C. § 101, *et seq*.  The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.     Defendant is subject to this Court's specific and general personal jurisdiction, pursuant to constitutional due process and the Texas Long-Arm Statute, due at least to its extensive business in the jurisdiction of the United States District Court, Northern District of Texas (this "District"), including its infringement alleged herein.  This Court has specific and general personal jurisdiction over Defendant at least because it (1) committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District; (2) regularly did business or solicited business in this District; (3) engaged in other persistent courses of conduct and derived substantial revenue by its offering of infringing product and services and providing infringing products and services in this District; and (4) purposefully established substantial, systematic, and continuous contacts with this District and should have reasonably expected to be subject to suit here by its maintenance of a regular and established physical place of business in this District and offering of infringing product and services and providing infringing product and services in this District.

7. Defendant, directly, has purposefully and voluntarily placed infringing products into this District and into the stream of commerce with the intention and expectation that the infringing products will be purchased for use in this District.

8. Venue is proper in this judicial district under at least 28 U.S.C. §§ 1391(b), (c) and/or 28 U.S.C. § 1400(b). Venue in this District is proper for Becker at least because Becker has committed acts of infringement in this District as detailed throughout this complaint, and Becker has a regular and established place of business in this District. For example, Becker has a regular and established place of business through its physical location in Dallas, Texas listed below.

9. Becker provides streaming multimedia content services to customers throughout the United States, which is accessible in and used by consumers in Texas and in this District through its website at https://www.becker.com/ in an infringing manner, as detailed throughout this complaint.  On information and belief, infringing activities, such as streaming, occur in this District as a result thereof.

10. In addition to its online website at https://www.becker.com/, Becker maintains a physical location at 10260 N Central Expressway, Dallas, TX 75231. At this physical location Becker offers live on-site courses in Dallas, Texas. On information and belief, infringing activities, such as streaming, occur at Becker's Dallas facility.



## **FACTUAL ALLEGATIONS**

11.     Founded in 1899 and based in Tokyo, Japan, NEC (Nippon Electric Company) has throughout its 120-year history been a world leader and innovator across a variety of technical industries, including in electronic devices, computing, computer displays, semiconductors, mobile phones and communications, and most recently, software and artificial intelligence solutions. Over the years, NEC has expended significant resources on research, development,  innovation, and on capturing and protecting the fruits of those efforts in patent applications filed around the world.  The patents-in-suit, which provide improved multimedia content delivery systems and methods, were born from this history of innovation.

12.     NEC is the owner of the patents-in-suit with all substantial rights, including the exclusive right to enforce, sue, and recover damages for past and future infringement.

4

13.     The claims of the patents-in-suit are directed to patent eligible subject matter under 35 U.S.C. § 101.  They are not directed to any abstract idea, and the technologies covered by the claims comprise content delivery and distribution systems and/or consist of ordered combinations of features and functions that, at the time of the invention, were not, alone or in combination, well-understood, routine, or conventional.

14.     On information and belief, Defendant offers content streaming services (the "Accused Products")—such as through the "Becker Web Application"—that deliver content data from a transmission device to one or more client devices.  For example, the Accused Products use a content distribution method applied to a distribution system including a transmission device and a reception device.

15.     On information and belief, the Accused Products also comprise a base server apparatus that relays data to be transmitted to a plurality of terminals from a distribution center and is disposed to a plurality of bases.

16.     On information and belief, the Accused Products also run on a client device and stores content received from the Becker server for playing.

17.     The patents-in-suit are described briefly as follows:

**The '809 Patent**

18.     On December 9, 2014, the USPTO duly and legally issued the '809 Patent, entitled "DELIVERY SYSTEM, DELIVERY METHOD, SERVER DEVICE, PROGRAM, AND CLIENT DEVICE" after a full and fair examination.  The '809 Patent is attached hereto as Exhibit A and incorporated herein as if fully rewritten.

19.     Claim 1 of the '809 Patent recites:

"1. A delivery system including a server device and a client device configured to be communicable with each other,

the server device being configured to be able to transmit, to the client device, content data in which a piece of content is encoded at an arbitrary one of a plurality of different bit rates;

the delivery system comprising:

a remaining reproduction time acquisition unit for acquiring remaining reproduction time that is a period of time during which the content can be reproduced based on a portion of the data stored in the storage device of the client device that has not been reproduced; and

a bit rate changing unit for calculating, according to a predetermined correction amount calculation procedure, a correction amount for correcting the bit rate of the content data transmitted by the server device based on the acquired remaining reproduction time and a preset target value so as to approximate the remaining reproduction time to the target value, and changing the bit rate based on the calculated correction amount,

the bit rate changing unit being configured to calculate, when the bit rate is within a predetermined correction amount reducing range, a correction amount having a smaller magnitude than a magnitude of the correction amount calculated according to the correction amount calculation procedure." *See* Exhibit A.

20.     At the time of the invention, a number of technical problems existed in streaming networks. For example, end users frequently did not have consistent bandwidth or quality of service. Exhibit A at 1:42-56. As a result, without adjustment to streaming methodology, users with lower quality of service or inconsistent bandwidth experienced undesirable buffering, unsteady or unstable playback resolutions, and/or excessively reduced quality to accommodate the weakest infrastructure.  Exhibit A at 1:42-47.  The problems are unique to the streaming and content delivery environment as the problems arise from technical constraints and the underlying operations associated with transmitting content over a network are not, for example, longstanding human activity or mental processes.  *Id.* at 4:21-24.

21.     By way of further example, user devices (or client devices) with different designs and different capabilities were being rapidly developed and updated. Exhibit A at 1:13-36. As a result, users with different devices or versions of hardware or software had different streaming experiences, including experiencing fluctuations in the quality of the playback, buffering, and other delays in receiving their streaming content.  Exhibit A at 11:15-21.

6

22.     At the time of the invention, other methods of addressing the technical problems existed, such as downloading the media completely before playback or reducing resolution or audio quality for all of the content for the entire stream.  These other solutions had drawbacks, such as delaying the ability to view or otherwise consume the content or reducing the quality to an unnecessary degree. *Id*.  For example, the '809 Patent specification confirms that in alternative content data delivery systems, the delivery to the client device can be interrupted when the remaining reproduction time of the content becomes too short.  Exhibit A at 1:31-33.

23.     The systems, devices, and methods of the '809 Patent improved upon other streaming methods at the time.  In particular, the '809 Patent itself identifies a previous method that used an alternative method, but it had shortcomings, in part, because it caused the bit rate to fluctuate constantly resulting in a decreased quality.  Exhibit A at 1:41-47.  The inability to adequately adapt to communications speed changes due to varying networking conditions resulted in cases where the available reproduction time was not able to reach a sufficient level by the start time thus delaying the start time.  Exhibit A at 1:58-64.

24.     The inventions claimed in the '809 Patent are new, inventive solutions that allow each user to be able to have the best streaming experience regardless of different equipment, different service providers, different quality of service, and the like and without the drawbacks of the other methods available at the time of the invention for addressing the problems. Exhibit A at 1:53-63.

25.     The claimed solutions are rooted in technology.  The inventions use operational characteristics of the streaming system, including the amount of content stored in the buffer or other storage of the user device (or reproduction device) as a function of remaining time for playback (or reproduction) of that content to determine and set the bit rate of the remaining data

to be transferred to scale the bit rate to a rate that ensures that the playback of the content on the user device does not outpace the transmission capabilities and buffering or storage capabilities of the client device. The recited technical solutions thereby avoid problems like unsteady or unstable playback qualities, pausing of playback to wait for more content, and delayed start of playback to wait for the entire content stream to be downloaded and prevent unnecessarily fluctuations in bit rate. Exhibit A at 17:15-63. The claims also recite how to reduce the amount of bit rate correction when the bit rate is within a predetermined correction amount reducing range, which improves the system and client device operation by not unnecessarily reducing the quality of the stream by allowing greater adaptability of the bit rate to changing or different technical conditions (e.g., when the user's bandwidth increases or decreases during the transmission). Exhibit A at 18:5-34.

26.     The claimed solutions recite more than just an abstract idea. Instead, the claims recite specific systems, apparatuses, and processes to determine code rate as a function of the remaining reproduction time at the client device and a preset value that are used to approximate and maintain the desired reproduction time to ensure that playback does not exceed the system's ability to transmit the remaining content data stream and also does not overly reduce the bit rate to unnecessarily degrade quality and do not merely recite results. Exhibit A at 29:33-36:59.

27.     As explained in reference to the '809 Patent, the claims are not directed to longstanding human activity because the claims recite calculating and changing the bit rate according to a variety of specific technical parameters. The bit rate is a technical concept as it is the density of bits relative to a period of time, which is directly proportional to the resolution of the content. Indeed, the '809 patent specification states "[a] reception rate that is a size of content data received by the client device 20 per unit time at a certain time $t$ seconds is represented by $V(t)$ bps. A bit rate of content data that the client device 20 is receiving at the time $t$ is represented by

b(t) bps." Exhibit A at 9:7-11.  By taking the inverse of the bit rate b(t), a media density can be found, which "represents a period of time during which the content can be reproduced based on the data of a unit size in the content data that the client device 20 is receiving at the time t." Exhibit A at 9:16-19.  Thus, in addition to humans not changing network and device operation and performance during streaming of digital content over a network, humans also do not change the bit rates of their own speech because to do so would be nonsensical, as human speech does not have a bitrate, let alone one humans can adjust.  The lack of connection to longstanding human activity is further illustrated by claims that recite the technical operation reducing a bit rate change if the change is within a particular range, determining a reception rate, applying further specific rules to select bit rates such as determinations of how fast the client device is reproducing the content, and the like.

28.     For example, Claim 1 of the '809 Patent recites a non-abstract system for distributing content data including server device being configured to be able to transmit and a the client device being configured to receive content data that solves the technical problems describes above, among others. It does so by reciting a system that determines the bit rate for a particular client device using operational characteristics of the device—and the playback time for reproducing the stored (or buffered) content and a set target value.  Exhibit A at 29:49-56.  The claim further recites adjusting the bit rate of the content data to the determined rate so that the content can be transmitted to the client device fast enough to avoid a pause in playback (e.g., due to buffering) but not so fast as to change the bit rate to an extremely high (e.g., unsustainable) level that will need to be rapidly shifted downward. *Id.* at 29:57-62. Further still, Claim 1 also recites further adjusting the bit rate based upon a determined correction amount, which depends upon both the remaining reproduction time for the content and a pre-set target value and then reducing the

magnitude of the correction amount if it is determined to be within a reducing range (e.g., if it is too high). Exhibit A at 29:55-56. Thus, Claim 1 recites more than merely results and more than simply sending and receiving data. It instead recites both how the bit rate is determined through the recited specific rules and how the operation of the network and performance of the client device is changed as a result of the recited system to improve the operation of the user device (e.g., less quality fluctuations, delay, pausing) and improve the user experience while simultaneously ensuring that the correction to the bit rate is not constantly over correcting itself. Thus, at least Claim 1 is not directed to an abstract idea and is inventive.

29.     Claim 1 also recites the specific technical environment that makes express that the claimed invention solves a technical problem. For example, Claim 1 recites a "delivery system" that ties the invention to a particular network environment that has many unknowns (e.g., quality of network, bandwidth constraints, telecommunication infrastructure, internet service provider quality, etc.). Exhibit A at 5:8-12. Claim 1 also recites that the content data includes "a piece of content encoded at an arbitrary one of a plurality of different bit rates" meaning that the correct bit rate needs to be identified and implemented to avoid poor performance at the client device. Exhibit A at 29:35-38.

30.     The remaining claim language provides a technical solution that explains how to use the remaining reproduction time, pre-set target value, and the reducing range to set the best bit rate to efficiently manage the available buffer of the client device without excessive or extreme shifting, which solves the technical problems associated with providing streaming content data to devices over a network with varying networking conditions. The claim recites various elements that explain that a "remaining reproduction time" is used (and explains exactly what a "remaining reproduction time" means), how a bit rate is calculated based on the information—via

approximating the remaining reproduction time to a target value—and calculating a smaller change in bit rates when the bit rate is within a predetermined correction amount reducing range.  In other words, the system and method allow for a more consistent bit rate (e.g., quality level) to be streamed while simultaneously ensuring that the buffer maintains a satisfactory amount of reproduction time so as to avoid buffering events or delays.  Exhibit A at 29:49-56.  As a result, the recited bit rate changing unit that "calculate[s], according to a predetermined correction amount calculation procedure, a correction amount for correcting the bit rate of the content data transmitted by the server device based on the acquired remaining reproduction time and a preset target value so as to approximate the remaining reproduction time to the target value, and changing the bit rate based on the calculated correction amount" allows the controlling device of the delivery system to determine whether the remaining reproduction time is sufficient relative to a target value.  Exhibit A at 29:49-56.  And the additional operation "to calculate, when the bit rate is within a predetermined correction amount reducing range, a correction amount having a smaller magnitude than a magnitude of the correction amount calculated according to the correction amount calculation procedure" changes the bit rate by a smaller amount to ensure that the buffer does not fall too low even though a larger change (e.g., and higher buffer rate) could be selected for the subsequent section. Exhibit A at 29:57-62. The result is less shifting in quality levels generally, less extreme shifting, and more stable management of the buffer all of which are solutions to the technical problem of providing streaming data over varying network conditions.  *Id.*

31.    The patent specification confirms that the claimed invention in Claim 1 is a technical solution to a technical problem.  In particular, an example technical improvement—proven through the inventor's "simulation" described in the patent (*see, e.g.*, Figs. 9, 10)—is highlighted in column 17, line 49 – column 18, line 50 of the specification:

Attention is first focused on a number of times the bit rate is changed (number of bit rate changes). The number of bit rate changes is 12 times when using the delivery system 1, whereas the number of bit rate changes is 311 times when using the delivery system described in Patent Document 1. *This means that the number of bit rate changes is much Smaller when using the delivery system 1 than when using the delivery system described in Patent Document 1.*

Thus, the number of times that the bit rate is changed can be decreased significantly by using the delivery system 1 in comparison when the delivery system described in Patent Document 1 is used. *As a result, the use of the delivery system 1 improves the user's quality of experience in comparison with when the delivery system described in Patent Document 1 is used.*

*Next, attention is focused on an average bit rate that is an average value of bit rates of delivered content data. The average bit rate is 838.1 kbps when using the delivery system 1, whereas the average bit rate is 836.3 kbps when using the delivery system described in Patent Document 1.* This means that the average bit rate when using the delivery system 1 is substantially equal to the average bit rate when using the delivery system described in Patent Document 1.

Thus, the use of the delivery system 1 makes it possible to deliver content data having a relatively high bit rate in the same manner as when the delivery system described in Patent Document 1 is used, even though the number of bit rate changes is small.

Next, attention is focused on remaining reproduction time. *The remaining reproduction time fluctuates relatively significantly when using the delivery system 1. However, the remaining reproduction time will not become excessively short. Therefore, unintended interruption of reproduction of the content is avoided effectively.*

32.    As a result of the recited altered technical operation of the streaming system using the recited system, a user device is able to play (or reproduce) the content with little to no jitter or pausing and without overly reducing the quality of the stream. Exhibit A at 1:42-47. Thus, the solution to the technical problems is found in the language of at least Claim 1.

33.    The inventiveness of these technical solutions recited by the claims of the '809 Patent is evidenced by what a provider of the underlying accused functionality has said about the accused functionality. Even years after the invention date, JW Player CEO, Dave Otten, highlighted the significance of the infringing process (which is claimed) that prioritizes video start time: "Video start speed is of the utmost importance to our customers, especially when their users

are watching video on mobile devices. Every second of delayed start or buffering can cost them millions of dollars of lost revenue." Exhibit E at 1.  The same article also notes the importance of maintaining the highest resolution (which is proportional to bit rate), further evidencing that the claimed system (that, among other things, changes bit rate) balances reducing delayed video start time and quality is inventive.  *Id.*

34.    Claim 1 of the '809 Patent also recites an inventive concept, including concepts that are not well-understood, routine, or conventional.

35.    The specific elements of Claim 1 of the '809 Patent recite an unconventional arrangement of elements compared to prior art content delivery systems. As also discussed above, at the time of the invention, other methods attempted to solve the problem differently. For example, Claim 1 of the '809 Patent was able to unconventionally change the bit rate of the content data to be transmitted to the client device as opposed to, for example, preventing playback until all content data is received or causing a pause in playback while additional data is received and prepared for playback. Claim 1 is similarly inventive over prior methods that reduced the quality of the entire content stream.  Exhibit A 17:49-18:50.

36.    At least the preset target value and reducing range limitations are unconventional and inventive because adjusting the bit rate based on the remaining reproduction time to the present target value and reducing the amount of change of the bit rate adjustment when the bit rate is within a predetermined correction amount reducing range were not well understood or routine at the time of the invention.

37.    The ordered combination of the limitations of Claim 1 are unconventional and inventive because using the remaining reproduction time and the pre-set target value to calculate a correction amount to the bit rate and using the calculated correction amount to change the

operation of the server device such that the client device is able to be more efficiently managed was not well understood or routine at the time of the invention.  Further, the adjustment of the correction amount when it is within a reducing range was also not well understood or routine at the time of the invention.  *Id.*  Thus, at least Claim 1 is inventive and patent-eligible under Section 779.

**The '779 Patent**

38.     On November 26, 2013, the United States Patent and Trademark Office ("USPTO") duly and legally issued the '779 Patent, entitled "BASE SERVER APPARATUS, COMMUNICATION METHOD, COMMUNICATION CONTROL PROGRAM, DISTRIBUTION SYSTEM, AND COMMUNICATION SYSTEM" after a full and fair examination.  The '779 Patent is attached hereto as Exhibit B and incorporated herein as if fully rewritten.

39.     Claim 1 of the '779 Patent states:

"1. A base server apparatus that relays data to be transmitted to a plurality of terminals from a distribution center and is disposed to a plurality of bases, the base server apparatus comprising:

a data distribution control unit that controls to distribute the data from the distribution center to the terminals;

a data accumulation unit that records the data transmitted from the distribution center in response to a request signal from the data distribution control unit;

a management table that associates the data recorded in the data accumulation unit and the terminal that is showing in a time-shifted viewing or the terminal requesting to pause playing the data,

wherein when the data distribution control unit receives a pause request signal for requesting to pause playing the data from the terminal, the data distribution control unit:

outputs the request signal for requesting to start recording the data to the data accumulation unit in response to the pause request signal from

the terminals when the same data as the data requested to pause by the terminal is not recorded to the data accumulation unit by request from other terminals,

distributes the data recorded in the data accumulation unit in response to a resume request signal for requesting to resume playing the data from the terminal requesting to pause playing the data, and

deletes the data recorded in the data accumulation unit with a completion of distributing the data to the terminal that requested to resume playing the data when there is no terminal that pauses playing the data or receives the data."

40.     The specific elements of Claim 1 of the '779 Patent are not directed to an abstract idea.  For example, the elements of claim 1 comprise an unconventional arrangement of elements compared to prior art apparatus' for playing content.  The elements recited in Claim 1 solve a number of technical problems that existed in streaming networks.  For example, the specification of the '779 Patent recognizes that using unicast communication for media streaming can "generate the load of the network according to the number of the viewing terminals," Exhibit B at 1:33-36, and that "the distribution side of the content data needs to store all the data to be distributed for the users who wish the time-shifted service."  Exhibit B at 2:5-8.  In light of these recognitions, the specification of the '779 Patent identifies "a problem that there will be massive cumulative amount of the content data." Exhibit B at 2:8-10.

41.     In light of the recognized problems in the prior art, the inventions recited in the '779 Patent "resolve such problem[s] and provide a base server apparatus, a communication method, a communication control program product, a distribution system, and a communication system that enables to reduce the data accumulated in the distribution bases of the content data." Exhibit B at 2:11-16. The inventions recited in the claims of the '779 Patent provide a solution to relay data to be transmitted to a plurality of terminals from a distribution center and is disposed to a plurality of bases.

42.     The inventions recited in the claims of the '779 Patent also provide solutions to technical problems.  For example, the specification of the '779 Patent explains that the inventions recited in the claims results in "reducing the data capacity to record," Exhibit B at 6:22-27, "reduces the process load and also distributes the load of the distribution center," Exhibit B at 36-40, and "reduce[s] the communication capacity between the distribution center 40 and the base server apparatus 10." Exhibit B at 6:45-47.  As another example, the specification of the '779 Patent explains that, according to the invention, "[e]ven if there is a failure in one of the base server apparatuses, the data can continue to be distributed in other base server apparatuses, and thereby reducing the extent of the impact in the service."  Exhibit B at 6:48-51.

**Count I: Infringement of the '809 Patent**

43.     Plaintiff realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

44.     On information and belief, Defendant directly infringes, literally and/or under the doctrine of equivalents, at least Claims 1, 2, 8, 13–15, 26, 27, 30, and 31 of the '809 Patent in violation of 35 U.S.C. § 271(a).

45.     On information and belief, Defendant makes, has made, offers to sell, sells and/or uses the Accused Products according to the above-identified claims.

46.     On information and belief, the Accused Products meet all elements of the above-identified claims in the '809 Patent.  The Accused Products include servers that transmit content data, and client devices that receive content data, at an adjustable bit rate as described in and claimed by the '809 Patent. Thus, Defendant's Accused Products infringe the '809 Patent.

47.     For example, use of the Accused Products include connecting a client device, such as a laptop, tablet, cellphone, or other portable device.  The bit rate of the content data is changed according to the remaining reproduction time, as described in Claim 1 of the '809 Patent.  Thus,

on information and belief, Defendant directly infringes Claim 1 by making, having made, offering to sell, selling, and/or using the Accused Products including the claimed content distribution system.  For example, Defendant infringes the '809 Patent at least when its instructors teach live classes using the Accused Products.  Defendant further infringes the '809 Patent by promotion and/or sales of the Accused Products to Becker's customers including, but not limited to, end-users, subscribers, and digital connected device platforms for implementing the content delivery system as claimed in the '809 Patent. A non-limiting and exemplary claim chart comparing Accused Products to the '809 Patent is attached hereto as Exhibit C.

48.     On information and belief, Defendant is liable for joint/divided infringement of, or is vicariously liable for infringement of, the '809 Patent by directing and controlling its customers' infringing conduct. For example, on information and belief, Defendant is liable for joint/divided infringement of, or is vicariously liable for infringement of, the '809 Patent at least when Defendant's customers use the Accused Products such as the "Becker Web Application,"

49.     Defendant has known of the '809 Patent at a date prior to the filing of this Complaint and has known of its infringement of the '809 Patent prior to the filing of this Complaint.  For example, NEC put Defendant on notice of its infringement of the '809 patent at least in a letter dated October 10, 2023.

50.     On information and belief, Defendant indirectly infringes, literally and/or under the doctrine of equivalents, at least Claims 1, 2, 8, 13–15, 26, 27, 30, and 31 of the '809 Patent.

51.     On information and belief, Defendant is liable for inducing infringement of the '809 Patent under 35 U.S.C. § 271(b) by having knowledge of the '809 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, direct infringement of the '809 Patent, with specific intent, by its customers.

52.     Specifically, Defendant induces infringement of the '809 Patent by training, promotion, and/or sales of the Accused Products to Becker customers for their use of the content distribution techniques as claimed in the '809 Patent.  On information and belief, Becker provides demonstrations and user manuals to Becker customers which teach or otherwise instruct users to use the Accused Products in an infringing manner.  Defendant's customers for the Accused Products directly infringe the '809 Patent by using the Accused Products as instructed by Defendant.

53.     As alleged above, Defendant had knowledge of the '809 Patent at a date prior to the filing of this Complaint and knew, should have known, or was willfully blind to the fact of Defendant's infringement of the '809 Patent at a date prior to the filing of this Complaint.  For example, NEC put Defendant on notice at least in a letter dated October 10, 2023.  Further, NEC has asserted the '809 Patent against others.  Defendant knew or should have known of a high risk of infringing the '809 Patent at least in light of NEC's letter and NEC's prior suits.  Despite knowing that its actions constitute induced infringement of the '809 Patent and/or despite knowing that there was a high likelihood that its actions constitute induced infringement of the patent, Becker nevertheless continues its infringing actions, and continues to make, use, sell, and/or offer for sale the Accused Products.

54.     Becker is liable for contributory infringement of the '809 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Products within the United States because the Accused Products constitute a material part of the invention embodied in the '809 Patent, which Becker knows to be especially made and/or especially adapted for use in infringement of the '809 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

55.     Specifically, Becker contributes to infringement of the '809 Patent by, inter alia, promotion, and/or sales of the infringing Accused Products to Becker's customers for their use of in the claims of the '809 Patent.  Those customers directly infringe the '809 Patent by using the Accused Products.

56.     By engaging in the conduct described herein, Defendant has injured NEC and is thus liable for infringement of the '809 Patent, pursuant to 35 U.S.C. § 271.

57.     Defendant has committed these acts of infringement without license or authorization.

58.     As a result of Defendant's infringement of the '809 Patent, Plaintiff has been, and will continue to be, damaged and will suffer irreparable injury unless the infringement is enjoined by this Court pursuant to 35 U.S.C. § 283 and/or the equitable powers of this Court.

59.     As a result of Defendant's infringement of the '809 Patent, Plaintiff has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendant's past and future infringement, together with interests and costs.

60.     As alleged above, Defendant had knowledge of the '809 Patent and at a date prior to the filing of this Complaint and knew, should have known, or was willfully blind to the fact of Defendant's infringement of the '809 Patent at a date prior to the filing of this Complaint.  Despite such knowledge, Defendant has intentionally continued its infringing activities.  Upon information and belief, Defendant's infringement of the '809 Patent is willful, entitling Plaintiff to enhanced damages pursuant to 35 U.S.C. § 284.  This action is therefore exceptional within the meaning of 35 U.S.C. § 285, entitling Plaintiff to its attorneys' fees and expenses.

61.     NEC is in compliance with 35 U.S.C. § 287.

**Count II: Infringement of the '779 Patent**

62.     Plaintiff realleges and incorporates by reference all of the allegations set forth in the preceding paragraphs.

63.     On information and belief, Defendant directly infringes, literally and/or under the doctrine of equivalents, at least Claims 1 - 4 of the '779 Patent in violation of 35 U.S.C. § 271(a).

64.     On information and belief, Defendant makes, has made, offers to sell, sells and/or uses the Accused Products according to the above-identified claims.

65.     On information and belief, the Accused Products meet all elements of the above-identified claims.  For example, with reference to Claim 1, the Accused Products include a base server apparatus that relays data to be transmitted to a plurality of terminals from a distribution center described in and claimed by the '779 Patent.  *See* Exhibit B.  Thus, Defendant's Accused Products infringe the '779 Patent.

66.     For example, use of the Accused Products includes running the Becker Streaming System.  Becker Streaming System comprises a base server apparatus (e.g., Becker edge location or regional edge cache servers) that relays data to be transmitted to a plurality of terminals (e.g., a user device) from a distribution center (edge cache servers or Becker server) and is disposed to a plurality of bases described in and claimed by the '779 Patent.  Thus, on information and belief, Defendant directly infringes the claims of the '779 Patent by making, having made, offering to sell, selling and/or using the Accused Products.  In particular, Defendant infringes the '779 Patent at least when its instructors teach live classes on the Accused Products and/or when classes are streamed on demand to customers. Defendant further infringes the '779 Patent by promotion and/or sales of the Accused Products to Becker's customers including, but not limited to, end-users, subscribers, and digital connected device platforms for implementing the claims of the '779

Patent.  A non-limiting and exemplary claim chart comparing Accused Products to the '779 Patent is attached hereto as Exhibit D.

67.    Defendant has known of the '779 Patent and its infringement thereof at least as early as the date of the filing of this Complaint.

68.    On information and belief, Defendant indirectly infringes, literally and/or under the doctrine of equivalents, at least Claims 1 - 4 of the '779 Patent.

69.    On information and belief, Defendant is liable for inducing infringement of the '779 Patent under 35 U.S.C. § 271(b) by having knowledge of the '779 Patent and knowingly continuing to cause or intend to cause, direct infringement of the '779 Patent, with specific intent, by its customers.

70.    Specifically, Defendant induces infringement of the '779 Patent by training, promotion, and/or sales of the Accused Products to Becker customers for their use of the invention as claimed in the '779 Patent.  On information and belief, Becker provides demonstrations and user manuals to Becker customers which teach or otherwise instruct users to use the Accused Products in an infringing manner.  Defendant's customers for the Accused Products directly infringe the '779 Patent by using the Accused Products as instructed by Defendant.

71.    As alleged above, Defendant had knowledge of the '779 Patent at least upon the filing of this Complaint and knew, should have known, or was willfully blind to the fact of Defendant's infringement of the '779 Patent.  Despite knowing that its actions constitute induced infringement of the '779 Patent and/or despite knowing that there was a high likelihood that its actions constitute induced infringement of the patent, upon information and belief Becker nevertheless continues its infringing actions, and continues to make, use, sell, and/or offer for sale the Accused Products.

72.     Becker is liable for contributory infringement of the '779 Patent under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Products within the United States because the Accused Products constitute a material part of the invention embodied in the '779 Patent, which Becker knows to be especially made and/or especially adapted for use in infringement of the '779 Patent, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use.

73.     Specifically, Becker contributes to infringement of the '779 Patent by, inter alia, promotion, and/or sales of the infringing Accused Products to Becker's customers for their use of the claims in the '779 Patent.  Those customers directly infringe the '779 Patent by, for example, using the Accused Products.

74.     By engaging in the conduct described herein, Defendant has injured NEC and is thus liable for infringement of the '779 Patent, pursuant to 35 U.S.C. § 271.

75.     Defendant has committed these acts of infringement without license or authorization.

76.     As a result of Defendant's infringement of the '779 Patent, Plaintiff has been, and will continue to be, damaged and will suffer irreparable injury unless the infringement is enjoined by this Court pursuant to 35 U.S.C. § 283 and/or the equitable powers of this Court.

77.     As a result of Defendant's infringement of the '779 Patent, Plaintiff has suffered monetary damages and is entitled to a monetary judgment in an amount adequate to compensate for Defendant's past and future infringement, together with interests and costs.

78.     As alleged above, Defendant had knowledge of the '779 Patent at least upon the filing of this Complaint and knew, should have known, or was willfully blind to the fact of Defendant's infringement of the '779 Patent.  Despite such knowledge, upon information and

belief, Defendant continues its infringing activities.  Upon information and belief, Defendant's intentional infringement of the '779 Patent is willful, entitling Plaintiff to enhanced damages pursuant to 35 U.S.C. § 284.  This action is therefore exceptional within the meaning of 35 U.S.C. § 285, entitling Plaintiff to its attorneys' fees and expenses.

79.    NEC is in compliance with 35 U.S.C. § 287.

## DEMAND FOR JURY TRIAL

80.    Plaintiff demands a trial by jury of any and all causes of action.

## PRAYER FOR RELIEF

81.    WHEREFORE, Plaintiff prays for the following relief:

82.    That Defendant be adjudged to have directly infringed the patents-in-suit either literally or under the doctrine of equivalents, and to have indirectly infringed the patents-in-suit by inducement and contributory infringement;

a.  Entry of a preliminary and/or permanent injunction against Defendant pursuant to 35 U.S.C. § 283 and/or the equitable powers of the Court to prevent further infringement of the patents-in-suit;

b.  An award of damages to Plaintiff and against Defendant pursuant to 35 U.S.C. § 284 adequate to compensate Plaintiff for the Defendant's past infringement and any continuing or future infringement, including compensatory damages, lost profits, and/or a reasonable royalty;

c.  A declaration that Defendant's infringement is willful and an award of enhanced damages, in the form of treble damages, pursuant to 35 U.S.C. § 284;

d.  An accounting of all infringing sales and damages including, but not limited to, those sales and damages not presented at trial;

e.  An assessment of pre-judgment and post-judgment interest and costs against Defendant, together with an award of such interest and costs, in accordance with 35 U.S.C. § 284;

    f.   That Defendant be directed to pay enhanced damages and Plaintiff's attorneys' fees incurred in connection with this lawsuit pursuant to 35 U.S.C. § 285; and

    g.   That Plaintiff be granted such other and further relief as this Court may deem just and proper.

Dated:  July 11, 2024                   Respectfully submitted,

                                    */s/ Harrison G. Rich/*

                                    Harrison G. Rich
                                    BAKER BOTTS L.L.P.
                                    2001 Ross Avenue, Suite 900
                                    Dallas, TX 75201
                                    Telephone: (214) 953-6896
                                    Fax: (214) 953-6503
                                    Harrison.rich@bakerbotts.com

                                    Robert L. Maier (pro hac vice forthcoming)
                                    Jennifer C. Tempesta (pro hac vice forthcoming)
                                    Michael E. Knierim (pro hac vice forthcoming)
                                    Thomas Natsume (pro hac vice forthcoming)
                                    Chun Xu (pro hac vice forthcoming)
                                    Stutti Tilwa (pro hac vice forthcoming)
                                    BAKER BOTTS L.L.P.
                                    30 Rockefeller Plaza
                                    New York, NY 77912
                                    Telephone: (212) 408-2500
                                    Fax: (212) 408-2501
                                    Robert.Maier@bakerbotts.com
                                    Jennifer.Tempesta@bakerbotts.com
                                    Michael.Knierim@bakerbotts.com
                                    Thomas.Natsume@bakerbotts.com
                                    Chun.Xu@bakerbotts.com
                                    Stutti.Tilwa@bakerbotts.com

                                    ATTORNEYS FOR PLAINTIFF NEC
                                    CORPORATION